Stephen A. Teller
Gregory A. Hitzel
Teller & Associates, PLLC
1139 34th Avenue, Suite B
Seattle, WA 98122
Phone: (206) 324-8969
Fax: (206) 860-3172

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JUL 02 2012

JAMES R. LARSEN, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

**SEALED**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
## AT SPOKANE

|  |  |
|---|---|
| UNITED STATES OF AMERICA; and STATE OF WASHINGTON, *ex rel.* JULIAN P. KASSNER, M.D., <br><br> Plaintiff, <br><br> vs. <br><br> KADLEC REGIONAL MEDICAL CENTER, a nonprofit corporation; KADLEC HEALTH SYSTEM, a nonprofit corporation; and COLUMBIA BASIN IMAGING, P.C., a professional corporation; RAND WORTMAN, a married individual; STEVEN WEIGHALL, M.D., a married individual; DWAYNE BRITTAIN, M.D., a married individual; CRAIG FEENEY, M.D., a married individual, <br><br> Defendants. | NO. **CV-12-5090-TOR** <br><br> COMPLAINT AND JURY DEMAND <br><br><br> **Filed Under Seal** <br> pursuant to <br> 31 U.S.C. §3730(b)(2) |

**COMPLAINT AND JURY DEMAND - 1**

COMES NOW the United States of America and the State of Washington, by and through JULIAN P. KASSNER, M.D., *qui tam* as Relator on his personal knowledge as follows:

## I. NATURE OF THE CASE

1.   Relator was recruited to perform designated health services for Defendants at Defendants' hospital and health care facilities from July 10, 2006, until March 30, 2008.   Prior to Relator's recruitment, Defendants agreed that Kadlec would pay $200,000 over a 24 month period for each newly recruited physician to perform designated health services within Kadlec's facilities, including Relator and other physicians.

2.   Such recruitment agreements violated the Federal Physician Self-Referral Law, 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 *et seq.* (also referred to as the "Stark Laws"), and Washington State's anti-kickback law, RCW 74.09.240.

3.   Subsequently, defendants submitted claims for payment to Medicare and Medicaid, while certifying that they were in compliance with state and federal law, when in fact Defendants were not.   Relator brings this qui tam action under the False Claims Act, 31 U.S.C. § 3730 *et seq.* and Section 205 of Washington State's Medicare Fraud False Claims Act to recover money damages and civil penalties arising from false statements and false claims knowingly submitted or knowingly caused to be submitted by Defendants to Federal and State governments, either through financial intermediaries and/or the State of Washington.

## II. PARTIES

4.   Kadlec Regional Medical Center and Kadlec Health System (hereinafter, "Kadlec") are both Washington Nonprofit Corporations that own and operate

**COMPLAINT AND JURY DEMAND - 2**

**Teller & Associates, PLLC**
1139 34th Ave, Ste B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

1  hospital facilities in Richland, Washington, servicing the healthcare needs of

2  Benton, Franklin and Umatilla Counties.

3      5.   Columbia Basin Imaging P.C. (hereinafter, "CBI") is a Washington

4  State Professional Corporation performing radiology services within Kadlec's

5  hospital facilities in Richland, Washington.

6      6.   Rand Wortman is the CEO of Kadlec, and has maintained this position

7  throughout the period of time in controversy.

8      7.   Steven Weighall, M.D., Dwayne Brittain, M.D., and Craig Feeney, M.D.

9  are all co-owners of CBI and were jointly responsible for the actions of CBI.

10           **III.  JURISDICTION and VENUE**

11     8.   Jurisdiction exists pursuant to 28 U.S.C. § 1331, 1345 and 31 U.S.C. §

12 3732(a) and (b) in that this action seeks remedies on behalf of the United States of

13 America for Defendants' violations of 31 U.S.C. § 3729 and on behalf of the State

14 of Washington for Defendants' violations of RCW 74.09.210-240.

15     9.   Any public disclosure of the allegations or transactions upon which this

16 suit is based is the direct result of Relator's actions, and the substance of this

17 Complaint and the allegations herein are not the product of such public disclosure.

18 *See* 31 U.S.C. §3730(e)(4)(A).  Knowledge obtained by the U.S. Government and

19 the State of Washington was the result of a disclosure made by the Relator.

20 Plaintiff previously filed a separate action with this Court, Cause No. CV-11-

21 5114-RMP.

22     10.  Relator is an original source in that Relator "has direct and independent

23 knowledge of the information on which the allegations are based."  31 U.S.C.

24 §3730(e)(4)(B).  Relator has voluntarily provided the information to the

25

government before filing this *qui tam* action and Relator was responsible for, and had a role in, any public disclosure of allegations that are a part of this suit.

11.   Kadlec operates a medical center and other health care facilities in Richland, Washington, in this judicial district.

12.   CBI performs health care services in Kadlec's facilities in Richland, Washington, in this judicial district.

13.   Defendants Rand Wortman, Steven Weighall, M.D., Dwayne Brittain, M.D., and Craig Feeney, M.D., all reside in or near Richland, Washington.

14.   Venue exists in the Eastern District of Washington pursuant to 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a).

## IV.  STATEMENT OF FACTS

15.   Prior to September 16, 2005, Relator was the Director of the Breast Care Center at the National Naval Medical Center, in Bethesda, Maryland.

16.   Relator was recruited by Kadlec and CBI to direct and further develop all of Kadlec's women's imaging programs and to serve as a general radiologist with full staff privileges at Kadlec.

17.   Relator agreed to relocate his family and medical practice from Bethesda, Maryland to Richland, Washington, a distance of over 2,500 miles.

18.   Relator and CBI executed a Nonshareholder Employment Agreement, dated September 16, 2005 (the "Employment Agreement").

19.   CBI included, among other things, a non-competition provision in the Employment Agreement, in violation of the Physician Self-Referral Law, 42 U.S.C. § 1395nn(e)(5), 42 C.F.R. § 411.357(e), and RCW 74.09.240.

20.   The non-competition provision included in Relator's employment contract purported to block Relator from practicing diagnostic or interventional

**COMPLAINT AND JURY DEMAND - 4**

radiology within 25-miles of the city limits of Richland, WA for 3 years upon termination of employment with CBI.  This geographic area includes the entire Benton and Franklin County area.  The noncompetition clause also purported to block Relator from soliciting any patients, physicians, hospitals, or institutions CBI does business, without any geographic limitation or expiration date.

21.  Without informing Relator, CBI and Kadlec entered into the Hospital Based Physician Services Agreement, dated November 23, 2005 (the "Services Agreement"), for the exclusive performance of radiology services within Kadlec's medical center facilities.

22.  Among other terms of the Services Agreement, Kadlec and CBI agreed that:

> (a)   No CBI radiologist shall, directly or indirectly, singly or together with any other person or entity within Benton and Franklin Counties:  (i) enter into a contract or arrangement for or engage generally in the provision of any professional or technical diagnostic imaging services or billing or receiving fees or reimbursement for such services; (ii) apply for or maintain medical staff appointment or privileges at any medical center or healthcare facility other than Kadlec;  (iii) establish a contractual relationship with any medical center or healthcare facility other than Kadlec; (iv) establish, own, operate, manage or direct any other diagnostic imaging services or venture or participate in any way in furnishing the professional or technical component of any diagnostic imaging services or venture or billing or receiving fees or reimbursement for such services or venture;  or (v) otherwise compete against Kadlec or its affiliated organizations (the "Restrictive Covenant").

**COMPLAINT AND JURY DEMAND - 5**

(b)    That this Restrictive Covenant was an essential term of the Services Agreement and Kadlec would not have entered into the Services Agreement without this Restrictive Covenant.

(c)    While the Services Agreement provides a narrow exception to the noncompete language for a "single radiologist," the Services Agreement goes on to state that in no event shall this "single radiologist" exception be construed or applied to permit, and the Medical Center expressly prohibits: two or more Radiologists becoming employed or engaged to provide such diagnostic imaging services by any competitor entity or affiliate thereof; one or more Radiologist(s) establishing, owning, operating, managing or directing a competing imaging center; one or more Radiologists forming a competing entity to offer or provide services to competitors which are the same or similar to the services furnished hereunder; or any other exception not expressly set forth in the Services Agreement (an additional "Restrictive Covenant").

(d)    The policies, rights, procedures, due process and other provisions of the Bylaws, rules and regulations did not apply to Relator's medical staff membership and clinical privileges at Kadlec (an additional "Restrictive Covenant").

(e)    Termination of medical staff membership and clinical privileges pursuant to the Services Agreement would be automatic and Relator would not be entitled to the rights and procedures afforded members of the Medical Staff by the Bylaws rules and regulations (an additional "Restrictive Covenant").

**COMPLAINT AND JURY DEMAND - 6**

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

(f)    Each CBI physician, including Relator, would sign a "Joinder Agreement" acknowledging and agreeing to be bound by the terms of the Services Agreement including, without limitation, the noncompetition agreement and forfeiture of rights provided by the Bylaws.

(g)    Kadlec would provide CBI "recruitment support assistance" to recruit needed radiologists, such as Relator, including interview expenses, relocation expenses and 50% of recruiter fees.  In exchange Kadlec would have the right to participate in the establishment of the recruited physician's terms of employment and review and approve the recruited physician's employment agreement.

(h)    Kadlec would make subsidy payments to CBI, including a "recruitment support subsidy" of $8,333 per month for 24 months for each recruited radiologist, such as Relator, as long as the radiologist agreed to the Restrictive Covenant.  This "recruitment support subsidy" was in addition to reimbursement for actual recruitment expenses detailed in the "recruitment support assistance" section of the Services Agreement.   This monthly "recruitment support subsidy" would automatically be reduced by 50% if the recruited physician became a partner in CBI.

(i)    Kadlec would pay CBI a "base subsidy" of $350,000 per year for among other things, "to secure the participation, cooperation and services of the [CBI] in assisting [Kadlec] enhance its role as a regional referral center . . . ."

23.    Each individual Joinder Agreement required the signature of both a Kadlec Executive and a CBI executive.

**COMPLAINT AND JURY DEMAND - 7**

24.   Relator was never a party to the Services Agreement and neither signed, nor was he asked to sign, a Joinder Agreement.

25.   Defendants failed to present the Joinder Agreement to Dr. Sean Koskinen, another newly recruited employee radiologist physician.

26.   Relator was never shown either the Services Agreement or the Joinder Agreement as part of his recruitment or employment negotiations.

27.   As part of his recruitment and employment negotiations Relator was never told about any of the subsidy payments negotiated between Kadlec and CBI including those directly linked to his own recruitment and employment.

28.   Relator negotiated his contract and relocated to Kadlec's service area unaware of financial arrangements between Kadlec and CBI that governed his employment.

29.   Relator negotiated his contract without access to the information necessary to determine which laws and regulations applied to his employment, as required by 42 C.F.R. § 411.357(e) and RCW 74.09.240.

30.   During his first year of employment, Relator's individual direct revenue generation for CBI exceeded $700,000 in professional service fees collected.

31.   Relator's revenue generation exceeded the total cost of his salary and benefits by over $200,000 per year.

32.   Relator's employment would have been highly profitable for CBI even without any "subsidy" payments from Kadlec in relation to his recruitment or employment.

33.   Relator and other CBI physicians referred patients to other Kadlec physicians and received referrals from Kadlec.

**COMPLAINT AND JURY DEMAND - 8**

34. Kadlec received significant amounts of technical and other fees as a direct result of procedures performed by Relator and other CBI physicians within Kadlec's facilities.

35. On October 20, 2008, Kadlec's President and CEO, Rand Wortman confirmed that Kadlec made no effort to provide any oversight regarding the allocation of recruitment subsidy funds paid to CBI.

36. On October 20, 2008, Mr. Wortman confirmed that he intended to enforce the terms of the Services Agreement, including Restrictive Covenants, despite the fact that Relator had neither seen nor signed a Joinder Agreement.

37. Kadlec and CBI's failure to comply with State and Federal law resulted in: (a) the payment of a kickback in violation of 42 C.F.R. § 411.353 and RCW 74.09.240; (b) CBI and its shareholders collecting and wrongfully retaining recruitment subsidy payments well in excess of the actual costs attributable to physician recruitment, in violation of 42 C.F.R. §§ 411.357(e)(4)(ii) & (iii); (c) Relator being denied access to material information that he was legally entitled to when negotiating his employment contract and making his decision to relocate to Washington, pursuant to 42 C.F.R. §§ 411.357(e)(1) and (e)(4)(i); (d) Financial incentives that undermine quality of care and the intent of the Stark Laws, which Relator would have never approved of; and (e) Relator's forced relocation out of Benton and Franklin County, undermining quality of care in the region, in violation of 42 C.F.R. § 411.357(e)(4)(vi).

38. Defendants falsely and fraudulently submitted claims to, and received payments from, the United States and the State of Washington by submitting hospital cost reports and a substantial number of claims for Medicare and

**COMPLAINT AND JURY DEMAND - 9**

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

1   Medicaid reimbursement.   Those claims reflected medical services provided to

2   referred patients that violated the Stark Laws and RCW 74.09.240.

3   **V. STATUTORY FRAMEWORK**

4   **A. Relevant State and Federal Statutes**

5   39.   The False Claims Act provides, in pertinent part, that:

6   [A]ny person who—(A) knowingly presents, or causes to be presented,
    a false or fraudulent claim for payment or approval; (B) knowingly
7   makes, uses, or causes to be made or used, a false record or statement
    material to a false or fraudulent claim; . . . or (G) knowingly makes,
8   uses, or causes to be made or used, a false record or statement material
9   to an obligation to pay or transmit money or property to the
    Government, or knowingly conceals or knowingly and improperly
10  avoids or decreases an obligation to pay or transmit money or property
11  to the Government, is liable to the United States Government for a civil
    penalty of not less than $5,000 and not more than $10,000, as adjusted .
12  . . plus 3 times the amount of damages which the Government sustains
13  because of the act of that person.

14  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(9).   Washington's Medicare Fraud False

15  Claims Act is substantially similar, with similar penalties.   Section 202.

16  40.   The Stark Laws prohibit physicians (and their immediate family

17  members) from referring patients for Medicare or Medicaid covered designated

18  health services ("DHSs") to an entity with which they have a financial

19  relationship, unless the financial relationship satisfies the requirements of an

20  exception to the prohibition.   42 U.S.C. § 1395nn; 42 CFR 411.353.

21  41.   Except as otherwise provided in the Stark Laws or its implementing

22  regulations, a financial relationship is defined as any ownership or, direct or

23  indirect, compensation arrangement.   DHSs include the following services, among

24  others:   (1) clinical laboratory services; (2) radiology and other imaging services;

25  (3) radiation therapy services and supplies; (4) prosthetics, orthotics and prosthetic

**COMPLAINT AND JURY DEMAND - 10**

1  devices and supplies; (5) outpatient prescription drugs; and (6) inpatient and

2  outpatient hospital services. 42 C.F.R. § 411.351.

3      42.  The Stark Laws expressly states no payment may be made by Medicare

4  for any DHS furnished in violation of the statute and further that any person that

5  bills and receives payment from Medicare for such DHS must refund the

6  payments.    42 U.S.C. § 1395nn(g); 42 C.F.R. §1003.102(b)(9); 42 C.F.R.

7  §411.353(d); 42 U.S.C. 1320a-7k(d).

8      43.  RCW 74.09.240 provides similar restrictions on Medicaid payments,

9  adopting the prohibitions and exceptions provided by the Stark Laws.

10  **B. The Medicare Program**

11      44.  In 1965, Congress enacted Title XVIII of the Social Security Act,

12  known as the Medicare program to pay for the costs of certain healthcare services.

13  Entitlement to Medicare is based on age, disability or affliction with end-stage

14  renal disease. *See* 42 U.S.C. §§ 426, 426-1.

15      45.  HHS is responsible for the administration and supervision of the

16  Medicare program.    CMS, formerly known as the Health Care Financing

17  Administration, is an agency of HHS and directly responsible for the

18  administration of the Medicare program.

19      46.  Part A of the Medicare Program authorizes payments for institutional

20  care, including hospital care. 42 U.S.C. §§ 1395c-1395i-4.  Medicare Part B

21  covers physician services as well as a variety of "medical and health services,"

22  including durable medical equipment and supplies.  In addition to other limitations

23  on coverage, Medicare covers only those services that are "medically necessary"

24  and expenses that are "reasonable." 42 U.S.C. § 1395u(b)(3).

25

**COMPLAINT AND JURY DEMAND - 11**

47.   To participate in the Medicare program, a hospital must file a provider agreement with the Secretary of Health and Human Services ("Secretary").   42 U.S.C. § 1395cc.   The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the program. *Id.*

48.   Form CMS-855A is the Enrollment Application for institutional providers.   All hospitals, including Kadlec, execute this form in order to participate in Medicare.   As part of completing the CMS-855A, a certification must be executed, which reads in pertinent part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

49.   To assist in the administration of Medicare Part A, CMS contracts with fiscal intermediaries.   42 U.S.C. § 1395h.   Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

50.   Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims on Form UB-92s for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.   42 C.F.R. §§ 413.1, 413.60, 413.64.

51.   In submitting Medicare claim forms, including the UB-92s at issue in this litigation, providers must certify that the information included on the form

**COMPLAINT AND JURY DEMAND - 12**

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

presents an accurate description of the services rendered and that the services were medically necessary.

52. The Secretary, acting through the fiscal intermediaries, reimburses hospitals in accordance with the laws and HHS regulations governing the Medicare program. 42 U.S.C. § 1395h. Under the inpatient hospital prospective payment system ("PPS"), hospitals are reimbursed a prospectively determined amount for each discharge, depending upon the diagnosis-related group ("DRG") which is assigned to the discharge. 42 C.F.R. § 412.1 *et seq.*

53. This case involves fraudulent hospital cost reports the Kadlec submitted to the Medicare program. The key purpose of the Medicare cost report system is to protect the federal government at all times from loss due to mistake or fraud. This goal is accomplished in several ways.

54. First, as a prerequisite to final payment by Medicare, CMS requires hospitals to submit annually Form 2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider hospital submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. Each year's report covers all the interim requests for reimbursement, such as the UB-92 forms in this case. Submitted during that cost reporting year.

55. Therefore, in reviewing each year's cost report, all of the claims submitted during that year will be audited and examined. Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than that already received through interim payments (*i.e.*, UB-92s), or whether the provider has been overpaid and must reimburse Medicare. Each cost report form reflects this reliance because it expressly states the consequences of a failure or refusal to certify:

**COMPLAINT AND JURY DEMAND - 13**

This report is required by law (42 U.S.C. § 1395g; 42 C.F.R. 413.20(b)). Failure to report can result in all interim payments made since the beginning of the cost report being deemed overpayments. (42 U.S.C. § 1395g).

42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1). Cost reports are due on or before the last day of the fifth month following the close of the cost report period. Thereafter, it may take 18 months or so for CMS, through its fiscal intermediaries, to complete an audit of the cost report.

56.    Second, after the review of the cost report, the fiscal intermediary issues a Notice of Program Reimbursement ("NPR") with its findings regarding the reconciliation of interim payments and the actual amount of the final payment as determined by the fiscal intermediary. Should the fiscal intermediary's audit conclude that an overpayment was made, that finding is reported in the NPR. The NPR serves as the basis for the intermediary immediately demanding payment of the contested amount within thirty (30) days, or it can withhold the contested amount from on-going reimbursements for the current year's services. 42 C.F.R. §§ 405.1803 & 413.64(f).

57.    Third, the fiscal intermediary has the authority to demand or implement immediate repayment of the full contested amount, even though the provider has several levels of appeals within the HHS bureaucracy, as well as a right to appeal to the appropriate United States District Court and the respective Circuit Court after applicable administrative remedies have been exhausted. This constitutes yet another layer of protection for the government.

58.    At all times pertinent to this Complaint, Kadlec was required to submit annually a hospital cost report on Form 2552 to the fiscal intermediary.

**COMPLAINT AND JURY DEMAND - 14**

59.  Each hospital cost report contains a certification, which is broad and explicit.  As a preface to the cost report's certification, the following warning appears:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.  FURTHERMORE, IF SERVICES INDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

60.  This advisory is followed by the actual certification language itself:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)—I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*Id.* (emphasis added).

61.  Thus Kadlec, as a Medicare hospital provider, was required to, and did, execute the cost report certification for each year from 2006 to 2008 to certify, among other things, that the filed cost report was (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that

**COMPLAINT AND JURY DEMAND - 15**

Kadlec was entitled to reimbursement for the reported costs in accordance with applicable instructions; and (3) complete, *i.e.*, that the hospital cost report is based upon all information known to Kadlec.

### C. The Medicaid Program

62.   Medicaid is a public assistance program providing payment of medical expenses for certain groups, primarily the poor and disabled.   Funding for Medicaid is shared between the federal and state governments.   Title XIX of the Social Security Act, 42 U.S.C. §§1396, *et seq.*

63.   Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.   The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation.   To participate in the Medicaid program, a state must develop a plan that is approved by the Secretary of Health and Human Services as meeting federal requirements.   The state pays qualified providers for furnishing necessary services covered by the state plan to individuals who are eligible for medical assistance.   The federal government contributes a proportion of the costs that each participating state incurs in purchasing items and services from qualified providers on behalf of eligible persons.   The state bears the remainder of the costs.

## VI. CLAIMS OF THE UNITED STATES AND THE STATE OF WASHINGTON

64.   The facts stated above give rise to a violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(C) & (G) and the Washington State Medicaid Fraud False Claims Act, Section 202(1)(a)-(c) & (g).

**COMPLAINT AND JURY DEMAND - 16**

65.  Defendants violated the Stark Law and RCW 74.09.240 when Kadlec and CBI entered into the recruitment arrangement within the Services Agreement, described above, which is a prohibited financial relationship.

66.  CBI and its owners received subsidy payments from Kadlec that exceeded the actual additional, incremental costs attributable to the recruited physician or received payments beyond the term of the recruitment arrangement without meeting any other applicable exception to the Stark Laws.

67.  Kadlec's financial relationships described above did not satisfy the requirements for any safe harbor or exception to the general prohibition on such relationships.

68.  The Restrictive Covenants imposed on Relator, including the non-competition clause in the Employment Agreement, were unrelated to the quality of patient care.  The non-competition clause violates the conditions for a permissible physician's recruitment agreement under the Stark Laws and RCW 74.09.240(3).

69.  Defendants failed to remit payment to Relator for the amounts of the recruitment subsidy payments, as required by 42 C.F.R. § 411.357(e)(1) and (e)(4).

70.  During the period of each improper recruitment relationship, Kadlec accepted referrals of patients covered by Medicare and Medicaid from CBI physicians who benefitted from those relationships, in violation of the Stark Laws and RCW 74.09.240, and submitted Medicare and Medicaid claims for such patients in violation of the law.

71.  Kadlec's costs reports covering periods from 2006 to 2008 included services to patients whose physicians had received inducements prohibited by 42

**COMPLAINT AND JURY DEMAND - 17**

1  U.S.C. § 1320a-7b(b) and/or other laws, thus rendering each of the Form 2552

2  cost reports a "false record or statement."

3     72.  The statements that "the services identified in this cost report were

4  provided in compliance with such laws and regulations" were false, where

5  Defendants were paying and receiving illegal kickbacks.

6     73.  Kadlec knowingly (as that term is defined by statute) submitted and

7  caused to be submitted such false statements to agents of the United States and the

8  State of Washington under the Medicare and Medicaid programs, as an essential

9  element in their claim submission process, in violation of 31 U.S.C. §

10  3729(a)(1)(A) and the Washington State Medicaid Fraud False Claims Act,

11  Section 202(1)(a).

12     74.  By the submission of such reports, Kadlec knowingly made, used, or

13  caused to be made or used, a false record or statement to get false or fraudulent

14  claims paid or approved by the United States in violation of 31 U.S.C. §

15  3729(a)(1)(B) and the Washington State Medicaid Fraud False Claims Act,

16  Section 202(1)(b).

17     75.  Kadlec knowingly presented Medicare and Medicaid claims to the

18  United States based on said false and fraudulent certifications.  Such conduct

19  constitutes the presentation of false claims within the meaning of 31 U.S.C. §

20  3729(a)(1)(A) and the Washington State Medicaid Fraud False Claims Act,

21  Section 202(1)(a).

22     76.  When Relator notified Defendants of their Stark Laws violations in

23  2007, Defendants failed to refund individual patients who were billed in violation

24  of 42 U.S.C. § 1395nn(a)(1), as required by 42 U.S.C. § 1395nn(g)(2) and 42

25  C.F.R. §1003.102(b)(9).  Such conduct constitutes the presentation of false claims

**COMPLAINT AND JURY DEMAND
- 18**

within the meaning of 31 U.S.C. § 3729(a)(1)(G) and the Washington State Medicaid Fraud False Claims Act, Section 202(1)(g).

77.   When Relator notified Defendants of their Stark Laws violations in 2007, Defendants failed to refund Medicare and Medicaid as required by 42 C.F.R. §411.353(d) and 42 U.S.C. 1320a-7k(d).   Such conduct constitutes the presentation of false claims within the meaning of 31 U.S.C. § 3729(a)(1)(G) and the Washington State Medicaid Fraud False Claims Act, Section 202(1)(g).

78.   Defendants conspired in planning, drafting and executing the above referenced scheme in violation of 31 U.S.C. § 3729(a)(1)(C) and the Washington State Medicaid Fraud False Claims Act, Section 202(1)(c).

79.   All payments made by the United States or the State of Washington to Defendants in respect of services provided to Medicare or Medicaid patients referred to Defendants by any of the physicians or the medical practices involved in these improper recruitment arrangements are subject to recoupment by the paying agency.

80.   Defendants are liable for the actions of their agents and their employees under the doctrine of Respondeat Superior.

## VII.   DAMAGES SUFFERED BY THE UNITED STATES AND THE STATE OF WASHINGTON

81.   As a proximate cause of the fraudulent practices described above the United States of America and the State of Washington have suffered damages in the amounts fraudulently billed to the United States and the State of Washington.

82.   The false statements and fraudulent misrepresentations contained in the Forms 2552 filed by Kadlec were a prerequisite for the Federal Government to pay millions of dollars to Defendants in Medicare reimbursements.   The false

**COMPLAINT AND JURY DEMAND - 19**

statements and fraudulent misrepresentations contained in the Medicaid Electronic Certification, filed by Kadlec, were a prerequisite for Washington State to pay millions of dollars to Defendants in Medicaid reimbursements.

83.   All Medicare and Medicaid claims presented by Defendants supported by the false and fraudulent certifications alleged above were claims which Defendants, under law, were not entitled to collect from the United States or from the State of Washington.    All Medicare and Medicaid reimbursements that Defendants did in fact collect supported by the submission of such false certifications were unlawfully collected as the result of the false statements alleged above.    The United States and the State of Washington were damaged by the payment of such claims in an amount equal to the total amount of such payments.

84.   All Medicare and Medicaid claims presented by Defendants to the United states and the State of Washington for payment based upon services rendered by physicians who were in prohibited financial relationships with Kadlec, were claims which Defendants were not entitled to collect from the United States or Washington State.    All payments which Defendants did in fact collect based on such claims were unlawfully collected as the result of the false statements alleged above.    The United States and Washington State was damaged by the payment of such claims in an amount equal to the total amount of such payments.

## X.  JURY DEMAND

85.   Relator hereby demands that factual determinations in this matter be decided by a jury of 12 persons.

**COMPLAINT AND JURY DEMAND - 20**

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

# X.  PRAYER FOR RELIEF

WHEREFORE Relator prays for damages as follows on behalf of the United States, the State of Washington, and/or on his own behalf, as appropriate:

1    Economic damages in an amount to be proven at time of trial.

2    A civil penalty per violation as allowed by the Federal False Claims Act and the State Medicaid Fraud False Claims Act.

3    Treble damages as provided for in 31 U.S.C. §3729(a) and the Medicaid Fraud False Claims Act, Section 202(1).

4    Prejudgment interest.

5    Reasonable attorney fees and costs.

6    Whatever additional damages allowed by law, which the court shall deem to be just and equitable.

DATED this 28th day of June, 2012.


_____

Stephen A. Teller, WSBA #23372
Gregory A. Hitzel, WSBA #39348
Attorneys for Relator Julian Kassner, M.D.

**COMPLAINT AND JURY DEMAND - 21**

**Teller & Associates, PLLC**
1139 34th Ave, Ste B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172